VINCENT' P. CADY, ET AL., v. NEW
· ORLEANS PUBLIC SERVICE, INC.,
Appellant

(October 5, 1925, Opinion and Decree)
(November 2, 1925, Rehearing Refused)

(*Syllabus by the Court.*)

1.  **Louisiana Digest—Street and Interurban Railroads—Par. 34.**

In an action for personal injuries against a street railway company, plaintiff must prove in order to recover that the accident happened under circumstances involving the negligence of defendant.

2.  **Louisiana Digest—Evidence—Par. 60, 352.**

When the evidence concerning the manner in which the accident happened is conflicting and doubtful there can be no recovery.

(Civil Code, Art. 2315.  Editor's note.)

Appeal from the Civil District Court, Parish of Orleans, No. 152,400, Division "G", Hon. Sam A. LeBlanc, Judge.

This is a suit for damages for personal injuries sustained by a minor child.

There was judgment for plaintiff and defendant appealed.

Judgment reversed.

Frank S. Norman, of New Orleans, attorney for plaintiff, appellee.

Benj. W. Kernan, of New Orleans, attorney for defendant, appellant.

WESTERFIELD, J.   Plaintiffs, the father and mother of Albert Cady, a ten-year-old boy, sue the plaintiff Street Railway Company on behalf of their son for personal injuries sustained by him in the sum of $20,000.00 and in their own behalf for mental pain and suffering $5000.00, or a total of $25,000.00.

It is alleged that the child on May 4, 1923, desiring to board a street car of defendant company, signalled the motorman to stop at the lower side of Terpsichore and Prytania streets; that the motorman responded to the signal by slowing the speed of his car to four or five miles per hour and nodded his head as an invitation for the boy to board the car; that while the car was moving at this slow pace, the boy attempted to board the car by taking hold of the grab-handle with his right hand and placing his right foot on the step; that while the boy was in this position and in the act of raising his left foot from the ground, the speed of the car was suddenly increased, causing the boy to lose his hold on the grab-handle and throwing him with such force against the rear portion of the step as to fracture his skull and otherwise severely injure him.

It is also alleged that the defendant company was in the habit of permitting passengers to board its cars while in motion and that plaintiff's son had himself on previous occasions boarded moving cars.

Defendant denied all charges of negligence and averred that plaintiff's son, Albert Cady, was playing with other children on the sidewalk of Prytania street and that as the Prytania car of defendant neared the corner of Terpsichore and Prytania streets where the children were at play, the Cady boy ran out intending to catch on the step of the car, but stumbled and fell, striking the edge of the car step as he fell.  Defendant denies that any signal was given the motorman or that answer or response was made by the motorman indicating in any way that he was aware of the boy's intention to board the car and invited him to do so.  It is also denied that there was any unusual slowing up of the car.

The case was tried by a jury which, by a vote of nine to three, returned a verdict in plaintiff's favor for $11,000.00. Judgment

was rendered accordingly and defendant has appealed.

If plaintiff's son was injured in the manner claimed in the petition, he must recover, for we understand the rule to be as stated in Corpus Juris, Vol. X, p. 950:

"Where a street car slows down and then suddenly starts up again before it has fully stopped, the carrier will be liable for injury to a passenger resulting therefrom, if the passenger, while in the exercise of due care, has reason to believe that the slowing down is for the purpose of enabling him to get on board or to alight or the place is one where passengers should naturally be expected to get on board or alight."

"Nor is it negligent to board a slowly moving electric car."

Jones vs. Canal and Carondelet R. R. Co., 109 La. 213, 33 South. 200; Pitard vs. N. O. Ry. and Light Co., 120 La. 926, 45 South. 943.

"It is a matter of common observation that persons do every day get on and off from street cars while they are in motion under circumstances that would not in the estimation of a reasonable man be considered negligence."

Finkeldaye vs. Cable Company, 114 Calif. 28, 43 Pac. 96.

"Although the act of boarding a car while in motion is always attended with some risks, the rules applicable to persons entering cars operated by steam are not usually applied with the same strictness to street railways. It is a general rule, established by numerous decisions, that if a person, who has the free use of his faculties and limbs, has given proper notice of his desire to be taken on, and the speed of the car is slackened in the usual manner, it is not negligence per se to attempt to get on while it is moving slowly, and that if a passenger is injured under such circumstances, the question of his contributory negligence is ordinarily one of fact for the jury."

Booth on Street Railways, p. 336.

Albert Cady, the injured boy, testified that he had been in the habit of meeting his aunt, Mrs. Baker, every Friday night at the terminus of the Prytania Line on Camp and Canal streets, for the purpose of going with her to a picture show or other place of amusement; that on the night of the accident (Friday, May 4, 1923, at 7:10 p. m.) he went to the corner of Terpsichore and Prytania streets, where he had been in the habit of boarding the Prytania car, for the purpose of meeting his aunt; that he arrived some fifteen minutes before car No. 372 of the Prytania line was due and, while waiting for this car, he was playing with several children on the corner. He explains that he was waiting for car No. 372 because he knew the motorman and conductor of this car by reason of his having often ridden with them before. He testifies further that as car No. 372 approached, he shouted to the children with whom he had been playing, "Watch me catch this car", or, as other witnesses put it, "Watch me hop this car", at the same time signaling with his hand to the motorman to stop; that the motorman nodded his head as a signal for him to get on the car as he had done on previous occasions and slowed up the car; that he attempted to board the car, grabbing the handle with his right hand and putting his foot on the step, when the car started forward, suddenly throwing him against the vestibule post, causing him to fall to the ground on his left side with his head resting on his arm and his head facing uptown; that he lay in this position until the blood flowed from his wound on his head when he got up and ran some two blocks to his home and his mother. Mrs. Jones, another aunt of the boy, was with him just before the accident, standing on the street corner talking with him, and she remained in that position until after the accident. She testified substantially, as did the boy himself, concerning his hailing the motorman, the

slowing of the car, the boy's effort to board it, its sudden acceleration, and consequent injury to the boy's head. In other words, this witness completely corroborates the plaintiff's theory of the accident. The case for plaintiff mainly rests upon the testimony of these two witnesses.

On the other hand, defendant has introduced a letter admittedly signed by counsel for plaintiff in which demand is made for compensation for injuries sustained by Albert Cady by reason of "having been run into by a downtown Prytania street car at the corner of Prytania and Terpsichore streets".

Another letter is introduced in evidence in which it is stated that the boy was run down by the car as he was crossing Prytania street. This second letter is unsigned, but the envelope in which the letter was enclosed bore the name, V. P. Cady, and the address, 1115 Terpsichore street, in the left-hand corner (the boy's father's name is Vincent P. Cady, and his address at the time of the receipt of the letter was 1115 Terpsichore street). The letter was registered. The letter reads as follows:

"New Orleans, August 3, 1923.
"Claim Adjuster,
"Care N. O. Public Service Corp.,
  "201 Baronne Street,
    "City.
"Dear Sir:

"You no doubt remember this accident that occurred on May 4, 1923, at 7:15 p. m. The injured, Albert Cady, while crossing Prytania street, was knocked down and seriously injured by the Prytania street car. My son suffered a permanent injury, namely, a fracture of the skull, which necessitated the removal of several bones by very delicate operations. He was attended at St. Rita's Hospital and is still in a critical condition.

"I have interviewed several people who witnessed the accident and each one agrees with me that the accident was caused purely through the negligence and carelessness of the person operating the street car, and they are all willing to testify to this effect.

"The writer, Mr. Vincent P. Cady, 1115 Terpsichore street, has an idea that this case can be amicably adjusted and would like to be informed of your feelings in the matter.

"A prompt reply will be very much appreciated.

"Yours respectfully."

Vincent P. Cady, testifying, denies any knowledge of the letter, but the letter was sent by someone and no explanation of this fact is offered. Even though not sent by the father and without his knowledge as he claims, it could hardly have been written by anyone other than a member of the injured boy's family directly or indirectly. At all events, the circumstantial account of the boy's injuries as narrated in the letter could only have been obtained from a source very close to home. A. T. Whitaker, an employee of defendant, testified that Vincent P. Cady, the boy's father, told him on the day after the accident that his boy declared as he came home just after the accident with his head bleeding that he had stumbled and a street car hit him.

W. H. Reynaud, Jr., claim agent of defendant, testified that in discussing the accident with him, Mr. Cady seemed to think his boy was hurt while crossing the street.

Robert E. Leithma, chief clerk of defendant, testified that Mr. Cady told him that his son was hurt while walking across Prytania street by the car crossing down Prytania street, knocking him down.

Dr. P. L. Thibaut testified that the injured boy told him on the day after the accident that he was walking across the street and stumbled on some bricks, fell and was struck by the street car.

Neil Brown, Coralie Nelson, Alfreda Nelson, Elena Delanor, the children with whom Albert Cady had been playing just

before the accident, all tell substantially the same story. They say in substance that Albert was playing with them and as the car approached he exclaimed, "Watch me hop that car", and ran from the sidewalk toward the moving car and was injured in the attempt to "hop" the car; that he had "hopped" another car that same evening and that the car had not slowed down but was moving fast.

R. J. Dorothy, a bookkeeper for the Alden Mills, and a passenger who was standing on the back platform of the car which injured Albert Cady at the time of the accident, testifies that the car was moving 12 or 15 miles per hour as it crossed Terpsichore street where the accident occurred. He saw a boy lying in the street about 75 feet away from the car.

The motorman denies having seen the boy on the crossing or to have nodded to him or to have slowed down as an invitation to the boy to board the car.

With the record before us we cannot give our approval of the verdict of the jury and the judgment based thereon. We fully realize that the findings of a jury as well as of a trial court upon questions of fact should not, under familiar principles often announced by appellate courts, be lightly considered or set aside unless manifestly erroneous. We also realize that in setting aside the verdict of a jury we are destroying the result of the labors of twelve men who have contributed days and perhaps weeks of their time taken from some gainful occupation by which they maintain themselves and their families and given to the public at the behest of the state. Nevertheless, it is plainly our duty to disregard a verdict and judgment in a case like the present, which, as it seems to us, is clearly contrary to the evidence.

The use of a jury in civil cases in Louisiana should be discontinued. Perhaps under the Common Law where facts found by a jury cannot be re-examined except under the rules of the Common Law, which means that the case must be remanded when the appellate court does not agree with the jury, there is some reason for a jury in civil matters, though it would appear advisable to amend the Common Law by statute, but in Louisiana where on appeal the case is disposed of and such judgment rendered as in the opinion of the appellate court should have been rendered in the first instance, there does not seem to be any justification for the retention of the jury in civil matters. The waste of the juror's time and the irritation of his feelings might be avoided without sacrificing anything, which makes for a better administration of civil justice.

It is interesting to observe that England, the natural parent of the Common Law, takes more liberties with its offspring than America, the foster parent. For in England, the archaic character of the trial by jury in civil causes has long been recognized and methods of doubtful propriety resorted to to mitigate the evil. In the Law Quarterly Review of July, 1891, an English periodical, there appears the following:

"To not only set aside a verdict, but at once enter a judgment for the other side, seems in these days of long-drawn-out litigation a daring mode of summary jurisdiction. Lord Halsbury in Toulmin vs. Miller (12 Ap. Cas. 746), had strong doubts about such a proceeding; but as the Court of Appeal is satisfied that it is invested with the power, its action undoubtedly saves a vast amount of trouble and expense. Trial by jury in civil cases, for whatever reason, is on the wane. The rules of court which reflect judicial experience began it by making trial by judge without a jury the normal mode of trial requiring the party who wants a jury to ask for one. (Jenkins

vs. Bushby, 91 Ch. (C. A.) 484). The frequent disagreement of juries has helped it on. The fact is not susceptible of doubt. Even in Queen's Bench Division non-jury actions outnumber the jury actions. * * * Ordeal, combat, jury have succeeded one another as tests of truth. Just now the wise and upright judge is in favor. The twentieth century may see a newspaper plebescite the approved mode of trial."

Perhaps the jury as a fact-finding instrument of justice (our juries interpret the law as well) will eventually be consigned to the legal lumber room, there to remain in a state of inocuous desuetude, not dead, but dormant, until some ferret of the law invokes his ancient constitutional right, whereupon discovering no jewel in the toad's head the jury in civil causes will be abolished.

Such was the experience in England with that other method of fact-finding and truth discovery known as the trial by battle which was introduced at the time of the Norman conquest and had long fallen into disuse, when in 1811 its discovery and invocation led to its abandonment as a means of discovering hidden truths in legal controversy in 1819.

The judgment appealed from is reversed and it is now ordered that there be judgment for defendant dismissing plaintiffs' suit at their cost.